UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMIE F.**, <br><br>        **Plaintiff,** <br><br>    v. <br><br> **UNITEDHEALTHCARE INSURANCE COMPANY,** <br><br>        **Defendant.** | Case No.: 19-CV-1111-YGR <br><br> **ORDER GRANTING MOTION FOR JUDGMENT IN FAVOR OF PLAINTIFF AND DENYING DEFENDANT'S CROSS-MOTION** <br><br> Dkt. Nos. 29, 30, 34, 35 |

Presently before the Court is plaintiff Jamie F.'s claim under a plan covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* by defendant UnitedHealthCare Insurance Company ("UHC"). Plaintiff alleges defendant improperly denied coverage for inpatient residential treatment services based upon lack of medical necessity. The parties filed cross-motions for summary judgment (Dkt. Nos. 29 and 34), and the Court heard the parties' arguments on February 11, 2020.

Having considered the parties' briefing, the administrative record,[1] and the oral arguments of the parties, the Court **GRANTS** plaintiff's motion for judgment and **DENIES** defendant's cross-motion.[2]

---

[1] The administrative motions to seal the administrative record (Dkt. No. 30, 35) and the motion to seal the one-page errata to the record (Dkt. No. 38) are **GRANTED**. The parties agree that the administrative record is comprised of the documents from UHC's production, designated by bates stamp "UHC/JamieF" (referenced as "UHC" for simplicity), and portions of plaintiff's production, designated by bates stamp "JamieF." (*See* Defendant's Responsive Separate Statement, Dkt. No. 33, at 2, n.1.)

[2] The parties conceded at the hearing of this matter that, although the motions are styled as motions for summary judgment, they are cross-motions for judgment pursuant to Rule 52 of the Federal Rules of Civil Procedure, given the matters to be decided by the Court. As such, this order constitutes findings of fact and conclusions of law pursuant to Rule 52(a).

## I. APPLICABLE STANDARD

Plaintiff appeals UHC's denial of benefits under ERISA, 29 U.S.C. section 1132(a)(1)(B). Beneficiaries and plan participants may sue in federal court "to recover benefits due to [them] under the terms of [their] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

A claim of denial of benefits in an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). The parties agree that the standard of review here is *de novo*. On such a review, the court conducts a bench trial on the record, and makes findings of fact and conclusions of law based upon that record. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (bench trial may "consist[] of no more than the trial judge reading [the administrative record].").[3]

Under a *de novo* standard, a court does not give deference to an insurer's determination to deny benefits. *Firestone*, 489 U.S. at 115 (1989). Instead the court "determines in the first instance if the claimant has adequately established" entitlement to benefits under the plan. *Muniz v. Amec Constr. Mgmt. Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). "In conducting a *de novo* review, the Court gives no deference to the insurer's interpretation of the plan documents, its analysis of the medical record, or its conclusion regarding the merits of the plaintiff's benefits claim." *McDonnell v. First Unum Life Ins. Co.*, Case No. 10-cv-8140, 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013); *Tedesco v. I.B.E.W. Local 1249 Ins. Fund*, No. 14-CV-3367 (KBF), 2017 WL 3608246, at *6 (S.D.N.Y. Aug. 21, 2017), *aff'd,* 729 F.App'x 136 (2d Cir. 2018) (citing *Firestone*, 489 U.S. at 112) (same).

Plaintiff bears the burden of establishing entitlement to benefits during the claim period by a preponderance of the evidence, and the Court must evaluate the persuasiveness of the conflicting

---

[3] The Court finds that the administrative record here suffices and a trial with live witness testimony is not necessary.

2

evidence to make its determination. *See Kearney*, 175 F.3d at 1094-95; *Eisner v. The Prudential Ins. Co. of Am.*, 10 F.Supp.3d 1104, 1114 (N.D. Cal. 2014).

## II. FACTS

Plaintiff Jamie F. is a covered dependent through her mother's group employee benefit plan. UnitedHealthCare Insurance Company is the underwriter of the insurance policy for the medical benefits at issue and administers the claims for mental health benefits through its subsidiary, United Behavioral Health (d/b/a Optum) (collectively, "UHC"). (UHC 01596.)

During the time period relevant here, plaintiff was a 19-year old Bay Area college student with a history of several mental illnesses including anorexia nervosa, depression, anxiety, obsessive compulsive disorder, and self-harming behaviors. (JamieF 1660, UHC 1574, UHC 0520.) She had been treated in residential treatment programs and outpatient "partial hospitalization" programs in 2015 and 2017, which resulted in a period of remission supported by outpatient treatment. In February 2018, plaintiff relapsed and was hospitalized. Following this last hospitalization, treating physicians recommended plaintiff transfer to a residential treatment facility in Utah called Avalon Hills. UHC's denial of coverage for residential treatment at Avalon Hills gives rise to the instant action.

### A. Plan Terms

The Certificate of Coverage contains the terms of the Plan governing the medical benefits at issue. Mental health services and supplies that do not meet the definition of a Covered Health Service are excluded from coverage under the Plan. (UHC 01627.) According to the Certificate of Coverage, "[t]he health care service, supply or Pharmaceutical Product is only a Covered Health Service if it is Medically Necessary." (UHC 01599.) The term "medically necessary" is defined as:

> *Medically Necessary (Medical Necessity)* - health care services provided for the purpose of preventing, evaluating, diagnosing or treating a health condition, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following:
>
> • In accordance with *Generally Accepted Standards of Medical Practice.*
> • Clinically appropriate, in terms of type, frequency, extent, site and

3

> duration, and considered effective for your health condition, Mental Illness, substance-related and addictive disorders, disease or its symptoms.
>
> - Not mainly for your convenience or that of your doctor or other health care provider.
>
> - Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your health condition, disease or symptoms.

(UHC 1667, italics in original.) The term "Generally Accepted Standards of Medical Practice" is likewise defined in the Plan as follows:

> *Generally Accepted Standards of Medical Practice* are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.
>
> If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. We reserve the right to consult expert opinion in determining whether health care services are Medically Necessary.
>
> We develop and maintain clinical policies that describe the *Generally Accepted Standards of Medical Practice* scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services. These clinical policies (as developed by us and revised from time to time), are available to Covered Persons on www.myuhc.com or by calling *Customer Care* at the telephone number on your ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.

(*Id*.) Mental Health Services, including inpatient services at a Residential Treatment facility, are a Covered Health Service that requires prior authorization. (UHC 01699.) Pursuant to the terms in the Certificate of Coverage, no benefits will be paid for a service determined not to be a Medically Necessary Covered Health Service. (UHC 01699 ["If you choose to receive a service that is not a Medically Necessary Covered Health Service, you will be responsible for paying all charges and no Benefits will be paid."].)

Plaintiff's Plan provides benefits for services by non-network providers only in certain situations. According to the Certificate of Coverage:

4

> "If specific Covered Health Services are not available from a Network provider, you may be eligible for Network Benefits when Covered Health Services are received from non-Network providers. In this situation, your Primary Physician or other Network Physician will notify us and, if we confirm that care is not available from a Network provider, we will work with you and your Primary Physician or other Network Physician to coordinate care through a non-Network provider.  If care is authorized from a non-Network provider because it is not available from a Network provider, you will be responsible for paying only the in- Network cost sharing for the service."

(UHC 01737.)  The Plan also permits claims to be made after the beneficiary has received medical services: "Post-service claims are those claims that are filed for payment of Benefits after medical care has been received." (UHC 1645.)

### B. Plaintiff's Treatment

Plaintiff previously received inpatient treatment for anorexia nervosa in 2015 and 2017. (JamieF 1660.)  Following her treatment in 2017, plaintiff received regular outpatient care with a psychiatrist, therapist, and physician and her illness went into remission.  (UHC 0527, JamieF 1660.)  On February 15, 2018, plaintiff appeared for a routine appointment with her regular physician, Dr. Jennifer Carlson.  Dr. Carlson determined that plaintiff had not been eating, had lost a significant amount of weight in a short time, and was engaging in self-harming behaviors.  Dr. Carlson noted that she had an abnormal heart rate (bradycardia) and was experiencing dizziness, fatigue, and loss of concentration.  (JamieF 1660, 1662.)  On Dr. Carlson's recommendation, plaintiff was admitted immediately to the inpatient unit at Stanford's Lucile Packard Children's Hospital ("Stanford") for medical stabilization.  (JamieF 1584, 1664.)

One week later, on February 21, 2018, plaintiff was to be discharged from Stanford, with a recommendation from her hospital treatment team to transfer her immediately to Avalon Hills for residential treatment.  (JamieF 1659, 1581, 1583, 1584, 1585.)  That day, Avalon Hills contacted UHC to seek pre-service authorization.[4]  UHC's initial reviewer determined that a "peer-to-peer

---

[4] Avalon Hills is an out-of-network facility with UHC.  According to the Certificate of Coverage, non-network mental health benefits require prior authorization before services are received. (UHC 01594, 01698-99.)

5

review" was needed before it would authorize benefits to pay for residential treatment. (UHC 00067, 00069.)[5]

On February 22, 2018, plaintiff transferred to Avalon Hills. Upon admission, her medical records indicate that she had severe malnutrition and bradycardia (UHC 0525).[6] She was refusing food and had a slight decrease in her weight in her first week. (JamieF 0584.) She met the diagnostic criteria for generalized anxiety disorder, obsessive compulsive disorder, and "Anorexia Nervosa, Restricting type, Extreme." (JamieF 1703.) Avalon's Intake Assessment, completed by therapist Michael Albright in conjunction with members of Avalon's treatment team, noted that plaintiff had a three-year history of eating disorder behaviors that she had been "unable to cease. . . following treatments at outpatient, intensive outpatient, partial hospitalization, residential, and inpatient levels of care." (JamieF 1701.) The Intake Assessment noted that she previously had attempted a partial hospitalization program after being hospitalized at Stanford for 10 days in July of 2015, but the program "did not go well" and she was transferred to a local residential treatment facility for three months. (*Id.*) While she had been stable from August 2016 to February 2018, her refusal to eat and plummeting weight required hospitalization at Stanford. Based on this history, and "[i]n light of her worsening condition," the Avalon Hills intake assessment concluded that, "[t]he severity of Jamie's eating disorder symptoms and level of medical acuity" made a residential treatment level of care "clinically necessary." (*Id.*)

---

[5] UHC's records indicate that at least six calls were documented between UHC and plaintiff, her family, and her medical team from February 16-26, some during her hospitalization at Stanford and some after her transfer to Avalon Hills, inquiring about coverage for the residential treatment program. (UHC 0064-72.)

[6] In its response to plaintiff's statement of facts, UHC disputed continued bradycardia, citing Stanford's discharge summary indicating that bradycardia was "resolved" as of discharge. (UHC 01524.) However, records regarding her admission to Avalon Hills indicate bradycardia continued to be an issue. (UHC 0525 [Avalon Hills Nursing Intake Assessment]; UHC 1575 [doctor's summary regarding course of treatment at Avalon Hills, noting bradycardia and several lab values outside normal limits].) Likewise, UHC's dispute of the discharge note regarding her food intake at Stanford did not account for Dr. Ammerman's correction indicating she had significant difficulty with her food intake throughout her hospital stay." (JamieF 1658-59.)

### C. UHC's Initial Review and Denial

On February 26, 2018, UHC reviewer psychiatrist Natasha Sane, M.D., conducted a "peer-to-peer review" to determine whether plaintiff's treatment at Avalon Hills should be authorized as medically necessary. Dr. Sane spoke with staff at Avalon Hills, including therapist Michael Albright. (UHC 00073.) Avalon Hills staff reported plaintiff as being 91% of her target weight, requiring supervision during and after meals, and having an abnormal heart rate. (UHC 00074.) Dr. Sane's notes indicate that plaintiff "continues to restrict" her eating, was recently hospitalized due to bradycardia, continues to have "orthostatic tachycardia" but "there is no indication that [patient] requires 24[-]hour medical or psychiatric care in [a residential treatment] setting." (UHC 00075.)[7] Dr. Sane's notes further stated that treatment at Avalon Hills did not meet the "coverage determination guideline required to be followed" specifically because plaintiff's weight was "stable" and "patients with Eating Disorders should be treated in the least restrictive level of care that is most likely to prove safe and effective." (UHC 00077.) Based upon Dr. Sane's assessment, UHC determined that residential treatment was not medically necessary and that plaintiff could be treated appropriately in an outpatient, "partial hospitalization program" closer to her home. (UHC 00075, UHC 0154.)[8]

On February 27, 2018, UHC issued a written denial letter regarding plaintiff's request for residential treatment at Avalon Hills. (UHC 0154.) Dr. Sane stated, based on her review of "the available documentation and all information received to date, I have determined that coverage is not available under your benefit plan." (UHC 0154.) The denial letter stated:

---

[7] It is unclear from Dr. Sane's notes whether she reviewed any of plaintiff's medical records, including those from Stanford, in making this initial review. After summarizing her conversation with staff at Avalon Hills, the notes state "I have asked the provider if there is any *additional* clinical and pertinent information that I need to review in order to make a determination, *including information from the medical records, beyond what was already shared with me*. He indicated that the above clinical information was sufficient to make a peer review determination." (UHC 0075, emphasis supplied.)

[8] Dr. Sane's notes do not indicate whether she was aware that plaintiff had previously been hospitalized in 2015 and discharged to a partial hospitalization program which proved unsuccessful, resulting in plaintiff needing to be transferred to residential treatment for several months.

7

> You do not seem to need residential treatment for your eating disorder. Your weight is stabilizing. You are now medically stable. You are not reported to be at risk of harm to yourself or others. There is no indication that you need 24[-]hour medical or psychiatric care. It seems you could work towards recovery at the partial hospital level of care.
> Based on Optum Level of Care Guidelines for MENTAL HEALTH Residential LEVEL OF CARE, it is my determination that authorization cannot be provided as of 2/22/18. It seems that treatment could continue at the mental health/eating disorder partial hospital level of care.

(UHC 00077, UHC 00154.)

### D. Plaintiff's Appeal of the Initial Denial

On April 11, 2018, plaintiff submitted an appeal of the denial of benefits to UHC through her counsel. (JamieF 1553-1761.) The appeal included copies of her medical records from February 22 to April 5, 2018 at Avalon Hills, along with four letters from plaintiff's treating physicians: Jennifer Derenne, M.D., Psychiatry Director of the Comprehensive Care Program for Inpatient Eating Disorders at Stanford's Lucile Packard Children's Hospital (JamieF 1580-1581); Seth Ammerman, M.D., pediatrician at Stanford's Lucile Packard Children's Hospital (JamieF 1582-1583); Dr. Jennifer Carlson, the outpatient physician treating her for the year prior to her hospitalization (JamieF 1584); Jennifer Zumarraga, M.D., plaintiff's psychiatrist for outpatient and prior partial hospitalization treatment (JamieF 1585-86). Each of those doctors recommended residential treatment at Avalon Hills.

Dr. Ammerman noted that Jamie had difficulty with food intake throughout her hospital stay despite support from her parents being present; had been severely restricting food by not eating for three weeks prior to her admission; and was "medically fragile" though stable when she was discharged from Stanford. (JamieF 1582-83.) He concluded that without the support of a program like Avalon Hills, "[Jamie] would very likely be quickly readmitted for medical instability." (JamieF 1583.)

Dr. Zumarraga, who had treated plaintiff in her first hospitalization for anorexia in 2015, stated that residential treatment was "absolutely necessary" due to Jamie's long history of eating disorder, anxiety, [attention deficit hyperactivity disorder, or] ADHD, and depression, which

8

resulted in rapid relapses and dangerously compromised health. (JamieF 1585.) Dr. Zumarraga noted that the "[t]he [American Psychiatric Association] Guideline. . . states that weight in relation to estimated individual healthy weight, cardiac function, metabolic status and psychosocial parameters are the most important factors to consider when determining what level of treatment is required." (*Id.*) Dr. Zumarraga noted that depression, anxiety, and ADHD all affect how Jamie copes with her eating disorder, requiring a highly structured environment to ensure treatment compliance, which her family could not provide. (JamieF 1585-86.) In Dr. Zumarraga's words:

> I have treated Jamie and have seen her through many phases of her illnesses. She is a driven young woman who struggles with a terrible illness which requires aggressive treatment and treating to outcome. The longer the recovery, the more difficult it is and the more often there is relapse. This illness, if not treated appropriately and at the adequate level of care (residential treatment in this case) puts Jamie at a higher risk for prolonged relapse and premature death.

(JamieF 1586.)

Dr. Derenne indicated that Jamie had struggled to eat adequately during her hospital stay, and though motivated to recover, was overwhelmed by upcoming life transitions [to college] and "fighting very strong eating disordered thoughts the entire time that she was awake." (JamieF 1581.). While noting that Jamie had lost over 10 pounds in the three weeks prior to her hospitalization, Dr. Derenne emphasized that "weight alone is not a good indicator of her clinical status and was not the sole determining factor in our clinical recommendations for ongoing care." (JamieF 1580.) Dr. Derenne, along with the whole treatment team, believed that Jamie needed "residential treatment in a unit that is geared toward adults—her previous residential experience was at a unit that specialized in treating adolescent eating disorders." (JamieF 1581.) As Dr. Derenne stated, "[w]e know that eating disorders have the highest mortality rate of any mental illness, and that quick, aggressive, subspecialized care is associated with the best prognosis." (*Id.*)

Dr. Carlson had been treating plaintiff since January 2017. She noted that the majority of plaintiff's nutritional intake during her hospitalization had been through liquid supplements, not food, and despite a motivation to be healthy, plaintiff was unable "to maintain her nutrition without

significant structure and support." (JamieF 1584.) Dr. Carlson concluded that "[d]irected and intense treatment is indicated at this time in order to present any future relapses and to enable Jamie to engage in school and life." (*Id.*)

### E.  UHC's Second Review and Denial

On May 18, 2018, Sherifa Iqbal, M.D., conducted an appeal review for UHC. (UHC 00081.) UHC's file notes by Dr. Iqbal indicate "current working diagnosis is Anorexia nervosa, Restricting – *Moderate*." (*Id.*, emphasis supplied.)[9] Dr. Iqbal listed the information used to complete the review as:

> Appeal Letter, Medical Records, Prior Physician Determination, Linx Notes, Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines

(*Id.*) After repeating Dr. Sane's case summary, Dr. Iqbal's notes state:

> The facility did not agree with the determination and requested a standard appeal. The medical records are reviewed. They correlate with the information from the review with the exception of patient denying [suicidal ideation] completely per the intake. The patient had been treated on the medical unit for 6 days prior to coming to [Avalon Hills]. She was cooperative, calm, engaged in care. Her family was supportive, albeit frustrated. Her vitals were stable. She was at above 90% her [ideal body weight]. . . . It does not appear that there were any medical or [mental health] issues that required 24[-]hour monitoring to be safely treated.

(UHC 00082.) Dr. Iqbal concluded as follows:

> Taking into consideration the available information, a review of the Certificate of Coverage for [the employer], and also the locally available clinical services, it is determination that the noncoverage determination for residential level of care will be upheld on 2/22/2018 and forward.
> ***
> Your daughter was at over 90% of her ideal body weight. She was calm and cooperative. She was not wanting to harm herself or others. It seems that her care could have occurred in a less intensive setting.

(UHC 00082-83.) Dr. Iqbal's notes do not reference any of the letters from plaintiff's treating doctors or their findings stated therein.

---

[9] Dr. Iqbal's diagnosis is the only one in the record to characterize plaintiff's Anorexia nervosa as "moderate" rather than "severe."

10

On May 20, 2018, UHC sent plaintiff a letter denying her appeal. (UHC 00166.) In the letter, as in the case notes, UHC listed the information reviewed without indicating whether the treating physicians' letters were reviewed. (*Id*.)[10] The denial letter, signed by Dr. Iqbal, repeated the statements in the case notes that the prior denial would be upheld because plaintiff was 90% of her ideal body weight, calm and cooperative, and not self-harming. (UHC 0166.) UHC's letter stated it was a final determination of administrative appeal per the terms of plaintiff's Plan. (UHC 00165-69.)

Plaintiff's treatment at Avalon Hills continued from her admission on February 22 to her discharge on July 16, 2018.

### III. ANALYSIS AND FINDINGS

The Court finds that the preponderance of the evidence in the administrative record demonstrates plaintiff was entitled to coverage under the Plan. Based upon a thorough review of the record including: plaintiff's diagnosis of Anorexia nervosa, severe; her co-morbid diagnoses of anxiety, depression, obsessive-compulsive disorder; her treatment history; her medically fragile state; and the recommendations of her treating physicians based upon medical standards, the Court concludes that residential treatment at Avalon Hills was medically necessary following plaintiff's week-long hospitalization at Stanford Children's Hospital in February 2018.

### A. Plaintiffs' Doctors' Recommendations Were Consistent with Generally Accepted Standards of Medical Practice

Plaintiff has demonstrated that residential treatment at Avalon Hills was in accordance with generally accepted standards of medical practice, based on the evaluations of the doctors who

---

[10] The Court notes that plaintiff's two-page appeal letter appears at UHC 0163-64 of the administrative record submitted by UHC, and UHC's denial letter follows immediately at UHC 0165-69. The letters from plaintiff's treating doctors do not appear in the administrative record until the submission of plaintiff's *post-service* claims appeal letter, *after her discharge from Avalon Hills*. (*See* UHC 1566-1572 [treating doctors' letters], UHC 1573-1576 [post-discharge letter from Avalon Hills doctor].) Thus, the order of the documents in the administrative record as provided by UHC suggests that the doctors' letters, though listed as enclosures to plaintiff's April 11, 2018 appeal letter provided on a CD-ROM, were not part of the materials reviewed at that time. Given this, UHC's assertion that they were considered by Dr. Iqbal, without more, is unpersuasive.

11

treated her. Plaintiff's treating physicians explained why residential treatment was medically necessary, referencing the APA standards. UHC does not challenge the opinions of these treating physicians now, nor did its reviewers challenge them in the authorization review process. In addition, UHC does not contest whether APA standards represent generally accepted standards of medical practice. Instead, UHC argues that its reviewers determined residential care treatment was not medically necessary under its own Optum Level of Care Guidelines: Mental Health Conditions (UHC 1833-46), and that the medical evidence supports those determinations.

First, to the extent that UHC suggests that plaintiff's appeal should be denied because its reviewers' determinations were supported by substantial evidence, it misapprehends the applicable standard here. Under a *de novo* review standard, the question is not whether UHC can point to substantial evidence in the record to support its decision, but whether, upon the Court's independent review, the plaintiff has established she was entitled to benefits under the plan. Moreover, the preponderance of the evidence in the record indicates that UHC's reviewers failed to consider the medical opinions of plaintiff's treating physicians or to conduct a thorough review of the medical evidence.

The doctors who were most familiar with plaintiff, her symptoms, and her treatment history all recommended residential treatment. There is no indication in its May 20, 2018 appeal denial letter that United considered those opinions at all.[11] While the Court is not required to give any particular weight to plaintiff's treating doctors' opinions, neither should it give deciding weight to

---

[11] Because UHC never disputed the treating physicians' opinions in the review process, plaintiff contends UHC waived its ability to do so in these proceedings. *Cf. Harlick v. Blue Shield of California*, 686 F.3d 699, 720 (9th Cir. 2012) (ERISA is undermined "where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary," quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004)); *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 (9th Cir. 2010) (same); *Nieves v. Prudential Ins. Co. of Am.*, 233 F. Supp. 3d 755, 764 (D. Ariz. 2017) (administrator did not raise argument during the appeal process, thereby "forfeited its ability to assert that defense in this litigation."). However, given that UHC offers no substantive counter to the treating physicians' opinions in this action, the Court need not rest its decision on waiver.

the opinions of a plan's reviewers who "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Courts generally give greater weight to doctors who have examined the claimant versus those who only review the file. *Holmgren v. Sun Life & Health Ins. Co.*, 354 F.Supp.3d 1018, 1030 (N.D. Cal. 2018) (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *Heinrich v. Prudential Ins. Co. of Am.*, No. C 04-02943 JF, 2005 WL 1868179, at *8 (N.D. Cal. July 29, 2005); *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 167 (6th Cir. 2007)). This is especially true in cases involving mental illness where there are no objective imaging or laboratory tests on which diagnoses are based. *See Smith v. Hartford Life & Acc.*, 2013 WL 394185, at *23 (N.D. Cal. Jan. 30, 2013) ("'Unlike cardiologists or orthopedists, who can formulate medical opinions based on objective findings derived from clinical tests, the psychiatrist typically treats his patient's subjective symptoms.'") (*quoting Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228, 255 (S.D.N.Y. 2005)). The Ninth Circuit has cautioned that "complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" *Salomaa*, 642 F.3d at 679 n. 35; *see also Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) (complete disregard for Social Security Administration opinion, without explanation, suggested failure to engage in principled reasoning and failure to consider relevant evidence in disability determination).

Further, UHC's determinations relied on characterizations of plaintiff's diagnoses, symptoms, and severity which omitted or were at odds with the information in her medical records from her Stanford hospitalization and Avalon Hills' intake. Dr. Sane's summary of the information provided by Avalon's staff significantly understates and omits information those same providers included in Avalon's contemporaneous Intake Assessment, suggesting that Dr. Sane either did not elicit or did not record that information. Dr. Iqbal's secondary review simply repeats Dr. Sane's summary and endorses the same determination. Rather than account for treating physicians' opinions or the medical records indicating the severity of her symptoms and co-morbid diagnoses,

13

UHC's reviewers appear to have focused entirely on their own assessment of her percentage of ideal weight, lack of current suicidality, and family support.

The APA Guidelines on which plaintiff's doctors relied emphasized that percentage of ideal weight is only one factor to be considered in assessing the appropriate level of care for a patient with a severe eating disorder. As Dr. Zumarraga explained:

> the standard of care in treating someone with an eating disorder states that, "it is important to consider the patient's overall physical condition, psychology, and behaviors, rather than simply rely on one or more physical parameter, such as weight." The APA Guideline also states that weight in relation to estimated individual healthy weight, cardiac function, metabolic status and psychosocial parameters are the most important factors to consider when determining what level of treatment is required.

(JamieF1585.) And while a generally supportive home environment may suggest a non-residential level of treatment, plaintiff's treating doctors found it was not enough to favor a lower level of treatment. Dr. Zumarraga noted that plaintiff had a history of declining "extremely rapidly" such that "[h]er family is not able to support her in the home with the type of treatment she needs." (JamieF 1586.) Similarly, Dr. Ammerman explained that "weight and nutrition are related but not the same. Jamie was still medically recovering from acute moderate malnutrition, and if unable to eat appropriately, would become acutely medically unstable." (JamieF 1583.)[12]

### B. UHC's Reliance on the Optum Guidelines

UHC argues that its reviewers relied on generally accepted standards of medical practice found in the Optum Level of Care Guidelines: Mental Health Conditions (UHC 1833-46; "Optum Guidelines"). UHC contends that the Optum Guidelines are a set of objective and evidence-based behavioral health criteria derived from generally accepted standards of behavior health practice. Indeed, the Optum Guidelines themselves reference several APA Guidelines, such as for psychiatric evaluation of adults, treatment of patients with suicidal behaviors, and the APA's

---

[12] Lack of current suicidal ideation is not a criterion for deciding whether between residential or community treatment, but instead is a factor for deciding whether *inpatient* hospitalization is needed, even under UHC's own guidelines. *See* Optum Guidelines at UHC 1842 ("member is *not* in imminent or current risk of harm to self").

14

Diagnostic and statistical manual of mental disorders, 5th edition (*i.e.*, the DSM-V). (UHC 1845.) However, the Court finds reasons to doubt the Optum Guidelines can be relied upon as a statement of generally accepted standards of medical practice in the present context.

First, several recent decisions have found that the Optum Guidelines are not consistent with any generally accepted standards of medical practice, including a sweeping, comprehensive review by the court in the *Wit* class action challenging the Optum Guidelines, among others. *See Wit v. United Behavioral Health*, No. 14- CV-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019); *see also S.B. v. Oxford Health Ins., Inc.*, No. 3:17-CV-1485 (MPS), 2019 WL 5726901, at *12-13 (D. Conn. Nov. 5, 2019); *Bain v. Oxford Health Ins. Inc.*, No. 15-CV-03305-EMC, 2020 WL 808236, at *10 (N.D. Cal. Feb. 14, 2020).[13] Even under a more general abuse of discretion standard, each of these decisions concluded that reliance on the Optum Guidelines were inconsistent with "generally accepted standards of medical practice" in the respective plans. Following a 10-day bench trial that elicited testimony from several mental health experts, the *Wit* court found that the Optum Guidelines are in conflict with generally accepted standards of care, such as those set forth by the APA, because they are focused on managing acuity rather than providing effective treatment, and therefore more restrictive than the generally accepted standards of care. *Wit* at 14-17, 55. Similarly, the district court in *S.B. v. Oxford Health* found the Optum Guidelines as applied to authorization for residential treatment of anorexia nervosa created restrictions that exceeded the bounds of "medical necessity." *S.B. v. Oxford Health Ins., Inc.*, 419 F. Supp. 3d 344, 362 (D. Conn. 2019) ("The introduction by the [Optum] Guidelines of this novel limitation on coverage exceeds the discretion granted. . . under the terms of the Plan. It represents a new requirement for coverage, rather than an elaboration on the definition of medical necessity set forth in the Plan; only the latter is contemplated by the terms of the Plan."); *see also L.B. ex rel. Brock v. United Behavioral Health Wells Fargo & Co. Health Plan*, 47 F.Supp.3d 349, 360

---

[13] The *Wit*, *Bain*, and *S.B.* decisions refer to United Behavioral Health or "UBH." United Behavioral Health, which does business as Optum, is a subsidiary of UHC and administers claims for mental health benefits on its behalf. (UHC 1589.)

(W.D.N.C. 2014) (court found denial of benefits unreasonable, noting "unprincipled and unreasonable claims review by UBH in applying these [Optum] Guidelines does not appear to be isolated," citing *Pacific Shores Hosp. v. United Behavioral Health,* 764 F.3d 1030 (9th Cir.2014)).

Second, the Optum Guidelines nowhere mention or reference eating disorders, nor do they reference any scientific literature or professional standards concerning eating disorders. Instead they are more general guidelines for mental health treatment which do not consider symptoms specific to eating disorders such as healthy body weight, compulsive exercise, structure needed to ensure eating and weight gain, and the level of monitoring needed to maintain medical stability. *See S.B.*, 419 F.Supp.3d at 355 (describing APA Eating Disorder Guidelines criteria and contrasting "the [Optum] Guidelines, which are intended to apply to all mental illnesses").[14]

Moreover, regardless of their validity, the Optum Guidelines do not support the UHC's reviewers' decisions. UHC reviewer Dr. Sane's recommendation skewed toward the generalization that "patients with Eating Disorders should be treated in the least restrictive level of care" without taking into account evidence of safety and effectiveness in concluding that partial hospitalization, not residential treatment, was appropriate. (UHC 00077.) The Optum Guidelines require that a lower level of care must be safe and effective. (UHC 1841-42.) The Optum Guidelines indicate that residential treatment is appropriate when:

> The factors leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to *acute changes in the member's signs and symptoms* and/or psychosocial and environmental factors. Examples include the following:

---

[14] UHC argues that the Optum Guidelines are incorporated as Plan terms. While the Plan's definition of medical necessity references "clinical policies" that "describe the Generally Accepted Standards of Medical Practice[,] scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services" (UHC 1667), the Certificate of Coverage does not list the Optum Guidelines among the documents included in the policy (UHC 1592). Rather, the Optum Guidelines appear to be "clinical guidelines" of no greater priority than other standards or evidence that would fall into the definition of "Generally Accepted Standards of Medical Practice." Certainly, the Court does not read the Plan as requiring that the Optum Guidelines be followed even when contrary or more specific standards of practice would require different treatment.

- *Acute impairment of behavior or cognition that interferes with activities of daily living* to the extent that the *welfare of the member* or others is *endangered*.
- Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

(UHC 1841-42, emphasis supplied)[15] Dr. Sane did not address why a level of care lower than residential treatment would address the acute changes plaintiff's treating physicians reported in her eating disorder symptoms—malnutrition, dramatic weight loss, irregular heartbeat, disordered thinking in relation to eating—which required her hospitalization despite plaintiff's regular outpatient treatment and family support. Dr. Sane's notes stated that plaintiff's weight was "stable" even though her records at Avalon Hills indicated she had lost a small amount of weight in her first week there. Dr. Iqbal's opinion merely referenced plaintiff's weight and lack of suicidality. Neither UHC reviewer's opinions accounted adequately for the safety and effectiveness of a lower level of care in light of plaintiff's symptoms and history.

"Placement in a less restrictive environment is appropriate only if it is likely to be safe and just as effective as treatment at a higher level of care in addressing a patient's overall condition, including underlying and co[-]occurring conditions." *Wit*, 2019 WL 1033730, at *19. All of plaintiff's treating doctors emphasized that the residential treatment level of care was necessary to provide safe and effective treatment given plaintiff's presenting symptoms, psychosocial factors, and treatment history. The weight of the medical evidence and opinions here does not support the determination that a partial hospitalization program would have been "just as effective" as residential treatment in addressing plaintiff's condition.

//
//
//

---

[15] By contrast, the Optum Guidelines' criteria for a partial hospitalization program indicate that observation, assessment, and interaction are needed for 20 hours per week, such as in a "coordinated transition back into the community" or a "structured environment to practice and enhance skills" with "face-to-face interactions several times a week." (UHC 1840-41.)

17

**IV.   CONCLUSION AND DISPOSITION**

Upon *de novo* review of the record, the Court finds that plaintiff was entitled to coverage for the residential treatment provided by Avalon Hills in 2018. Plaintiff's motion for judgment is **GRANTED** and defendant's cross-motion is **DENIED**.

The parties shall, within thirty (30) days of the date of this Order: (1) meet and confer to resolve the amount of unpaid benefits due, and (2) submit a proposed judgment approved as to form consistent with the terms of this Order.

This terminates Docket Nos. 29 and 34.

**IT IS SO ORDERED**.

Date:  July 23, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**